THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* VICENTE AYALA ORTIZ, Defendant and Appellant.

No. CR-67-134.     Decided April 2, 1969.

*César Andréu Ribas* for appellant. *Rafael A. Rivera Cruz, Solicitor General,* and *Elpidio Arcaya, Assistant Solicitor General,* for The People.

MR. JUSTICE RAMÍREZ BAGES delivered the opinion of the Court.

On account of some firearm shots in a public street of Barrio Obrero in Santurce which wounded a young man in

the abdomen and passed through the shoe of another, appellant Vicente Ayala Ortiz was arrested, after determining probable cause against him of the commission of two offenses of assault with intent to commit murder and of two violations of §§ 6 and 8 of the Weapons Law. On the preliminary hearing, the trial court ruled that there was not sufficient evidence to prosecute appellant for the offenses of attempts to kill, but there was for violations to §§ 6 and 8 of the Weapons Law. Guillermo A. Gil, Judge of the Superior Court, affirmed the ruling that there was not sufficient evidence to prosecute appellant for the offenses of assault to commit murder. After the trial was held in the Part of said court presided by Judge Gerardo Carreira Más, appellant was found guilty of violations to §§ 6 and 8 of the Weapons Law, and sentenced to serve concurrently the penalties of one year in jail and from two to four years in the penitentiary, which were suspended under certain conditions under the authority of Act No. 259 of April 3, 1946 (34 L.P.R.A. § 1027).

On appeal he alleges that the trial court or the jury, or both, erred (1) in depriving appellant of a fair and impartial trial when the trial judge made certain statements in the presence of the jury which obviously indicated his opinion concerning the evidence and the character of the witnesses; (2) in finding him guilty although the weapon was neither seized nor properly described; (3) in giving entire credit to witness Agustín Luna Roque who admitted that he was drunk at the moment of the occurrence of the facts which gave rise to the prosecution, thus depriving appellant of the benefit of reasonable doubt; and (4) in the trial judge making statements before the jury that he was going to charge the witness for the prosecution, Pascual Oyola Sánchez, with contempt on account of perjury, as so he did later, in asking the marshal in the presence of the jury to bring the Penal Code into the courtroom.

We relate below the evidence for the prosecution:

1. Antonio García Tapia, after testifying that on February 30 [*sic*], 1966, at about 10:30 in the night while he was on Principal Street in Barrio Obrero in Santurce, in front of the bar known as La Cuerda Floja he saw appellant there "because they told me he was called that way." His examination continues as follows:

"PROSECUTING ATTORNEY:

Q. What happened there that night that called your attention?

A. I was talking there and there I saw defendant, since he has already been accused, and he called Cheguán.

Q. Who went there, who?

A. That man over there, Vicente Ayala.

Q. What happened?

A. He came and told him 'well let's settle this.'

Q. To whom did he say those words?

A. To the aggrieved.

Q. Who is the aggrieved?

A. José Juan.

Q. Is that Cheguán?

A. Yes, sir.

Q. What did he tell him?

A. That now they were going to settle things.

Q. What happened then?

A. He fired a shot at his feet and another at his stomach.

Q. At Cheguán?

A. Yes, sir.

Q. And with what did he fire those two shots?

A. With a nickel-plated revolver, short barrel.

Q. A nickel-plated revolver, short barrel?

A. Yes.

Q. Did you see that?

A. Yes, sir.

Q. And did you see that man, did you see defendant Vicente Ayala Ortiz when those two shots were fired?

A. As I told you now, he was accused because it was said he had done it.

Q. Don't you know whether or not he did it?

A. *I say it was him because it was said; but I did not know him nor did I identify him there, but at the police station.*

Q. You did not identify him at the police station?

A. I was told he had been there and they went to look for him.

Q. Don't you know who was the person who fired the shots?

A. *The person who fired the shots was taller than him and had a lighter complexion.* (Italics ours.)

Mr. ANDRÉU RIBAS

Q. What?

A. Had a lighter complexion."

After reading his own sworn statement where the witness states that it was appellant who fired the shots, he testified as follows:

"PROSECUTING ATTORNEY:

Q. Whether or not it is true that it was not Vicente Ayala Ortiz but a man of lighter complexion, taller, called Bullín?

A. Yes, sir.

Q. And in your sworn statement you stated that it was Vicente Ayala Ortiz?

A. It was Vicente Ayala Ortiz because they told me that that was his name.

JUDGE:

Q. The person, forget the name, who fired the shots, who is he?

A. *The person who fired the shots I told you, the one who did it is taller than him.*

Q. *Then, it is not this defendant?*

A. *No sir, I beg your pardon, because I gave the name that way but I know for myself that it was not him because the person was taller and of a lighter complexion.* (Italics ours.)

PROSECUTING ATTORNEY:

Q. However, in your sworn statement you said it was Vicente Ayala Ortiz?

A. Because I was told he had been the one, that name but *for myself and for God I know that he was not.*" (Italics ours.)

2. The examination of Pascual Oyola Sánchez was partly conducted this way:

"Q. Do you know or know who is Vicente Ayala Ortiz?

A. Well, I know him by the name.

Q. He is present in the courtroom today, will you please point him out?

A. I cannot tell who he is.

JUDGE:

Q. Where is that person that you know now by the name of Vicente Ayala Ortiz?

A. That man who is present.

Q. Then why do you say you do not know? Let us proceed.

.     .     .     .     .     .     .     .

Q. And you saw there, I ask you, that night, if you did see him, that man who is there?

A. Well I cannot tell for sure because I knew him as Bullín.

JUDGE:

Q. Did you see that person known as Bullín?

A. I cannot tell you because I did not see him very well. I am not quite sure.

PROSECUTING ATTORNEY:

Q. Who was the person you saw, that you say you are not quite sure?

A. Well I am not sure.

Q. And what did happen there, if something happened?

A. Well we were talking to José Juan, saying some words, and then a man I know as Bullín came and then told him 'let us settle this now' and drew out a revolver.

JUDGE:

Q. A man you know as Bullín arrived there.

A. It is by the name that I knew.

Q. That you knew as Bullín?

A. That I knew as Bullín.

Q. I do not understand, did you know him as Bullín or by the name?

A. By the name.

Q. By what name did you know him?

A. By the name because it was mentioned there, the man was called Bullín.

Q. That man?

A. I knew one Bullín but I don't know the . . .

Q. Do you know more than one Bullín?

A. I have seen them many times.

Q. Who have you seen?

A. The people when they go by there where I have talked to my friends.

Q. Whom have you seen many times?

A. Many persons.

Q. Have you seen that Bullín many times?

A. Yes.

Q. Where is that Bullín that you, describe him to the ladies and gentlemen of the jury, how is he?

A. I cannot identify him very well because I tell you that through friends of mine who have been talking I know him as Bullín.

Q. Describe to us that person you have known as Bullín.

A. I have not seen him very well.

Q. Didn't you say that you have seen him many times?

A. I cannot identify him very well.

PROSECUTING ATTORNEY:

Q. Listen, what happened there, tell me?

A. Well we, several persons, were talking there, I was with José Juan and then came a man I know as Bullín . . .

Q. Did you see that man well?

A. I did not see him well.

Q. How do you know he was Bullín?

A. By the name, sir.

Q. A man came and you say 'I know him as Bullín', did you know he was Bullín when you saw him?

A. I am not quite sure if he was Bullín.

Q. What happened then?

A. Well, he took out a nickel-plated revolver from his waist and fired a shot at his legs. First he said: 'this must be settled' and then he fired another at his belly.

Q. Whom did he fire at?

A. At José Juan.

Q. And what happened then?

A. Then together with us, he fired two shots at one of them and scraped one of his shoes and he also fired at José Antonio.

Q. What happened then?

A. After that he ran away and they got into a Chevrolet car this way, I do not know whether he was with another man.

Q. Who got into?

A. That man I know as Bullín.

JUDGE:

Q. Is that man you know as Bullín a human being, a ghost, a negro, a white man?

A. The name.

Q. How was that man you know as Bullín, was he a white or a colored man?

A. As I saw him in my own way he was a tall skinny man.

JUDGE:

You may proceed prosecuting attorney.

JUDGE:

Q. Are you over 18 years old?

A. Eighteen.

Q. Eighteen already?

A. Yes.

JUDGE:

Fine. Marshal bring me the Penal Code. Proceed.

MR. ANDRÉU RIBAS:

Let us ask the jury to withdraw.

JUDGE:

Of course. Withdraw the jury."

After the jury retired the counsel for the defense stated the following to the court:

"JUDGE:

What question?

MR. ANDRÉU RIBAS:

I will raise it now. Your Honor, the question I am going to raise is that I understand Your Honor, that Your Honor has said; so it must appear from the record, while this witness is testifying, You have interrupted the prosecuting attorney's examination to tell the witness, to ask him after making certain statements 'Look is it a human being . . .'

JUDGE:

All that is in the record.

MR. ANDRÉU RIBAS:

Before the jury; you have asked him his age, when he says 18 years you say 'fine' and you send for the Penal Code, before

the jury, and the defense, with the due respect to Your Honor and as magistrate he tells Your Honor that in his opinion Your Honor is injuring the rights of this defendant when upon hearing from witness the words he has just said, a very tall skinny man, Your Honor interrupts the examination to make all those statements.

. . . . . . . .

MR. ANDRÉU RIBAS:

I ask you not to do those things because you are causing prejudice to my client. Your Honor is the judge in the contention but not a party and upon acting in this way you give the impression to the jury that you reject what this man has just said, that you are going to charge him with contempt or perjury.

. . . . . . . .

MR. ANDRÉU RIBAS:

I respectfully request Your Honor that any action which you may take against this witness, if you have any grounds for it, please do it without stating so before the jury."

After reading him his sworn statement the examination continued as follows:

"PROSECUTING ATTORNEY:

Q. I ask whether you testified: 'while we were talking there came a man I know as Bullín, now I am informed he is Vicente Ayala Ortiz, and told José Juan "this must be settled" and he drew out . . .'

A. Yes, sir.

Q. Did you declare that under oath?

A. Yes, sir.

Q. How can you explain that?

A. What do you mean to explain?

Q. How can you explain?

A. I explain about what is put down there. As to what is missing.

JUDGE:

Not as to what is missing.

A. Where is it?

PROSECUTING ATTORNEY:

Q. That the person who had fired the shots was Bullín, that later you learned he was called Vicente Ayala Ortiz.

A. I learned about it because I heard it at the court, at the prosecuting attorney's office.

Q. Is that your explanation?

A. Yes, sir.

Q. And did you talk to any lawyer, or to defendant, or to any relative of the defendant or to any person in relation to this case?

A. No, sir.

.    .    .    .    .    .    .    .

MR. ANDRÉU RIBAS:

Q. When you were there that you said that the person who had fired was one Bullín and that now I learn what his name is; who gave you that name?

A. That was the people's remark.

Q. You were at the police station, ah, and where did you go to testify that?

A. To the prosecuting attorney's office.

Q. At any time when you said one Bullín, at any time did they take this defendant before you to see whether he was Bullín?

A. No, sir.

NOTHING MORE.

JUDGE:

You may retire. Marshal, keep this witness under custody of the marshal.

MR. ANDRÉU RIBAS:

With our exception.

JUDGE:

Let it be entered in the record.

MR. ANDRÉU RIBAS:

That is done despite the fact that I have told Your Honor not to indicate anything in the presence of the jury.

JUDGE:

The court knows what to do and does it assuming what has to be done and knowing what the law is. Proceed."

Witness Agustín Luna Roque testified as follows:

"Q. Did you see him, Vicente Ayala Ortiz on that day, about September 30, 1966, at about 10:30?

A. Yes, sir.

Q. You saw him; what happened if anything happened while you were in front of La Cuerda Floja?

A. I was inside the business.

Q. And what happened?

A. I did not know what happened between them both.

Q. Ah?

A. I did not know what happened outside.

Q. Did you hear something, if you did hear anything?

A. I heard the two detonations only.

Q. Listen, how do they call that man Vicente Ayala Ortiz?

A. Bullín.

Q. Was that the Bullín you saw there that night?

A. Yes, sir.

Q. After you heard two detonations, what did you do, if you did anything?

A. *I went out to see what it was.*

Q. And what did you see?

A. *He had gone already. Running.*

MR. ANDRÉU RIBAS:

Strike it out.

JUDGE:

What?

MR. ANDRÉU RIBAS:

Strike all that out because he did not see him then. He cannot say, if he saw him running.

JUDGE:

Q. Did you see him running?

A. Yes. I saw him but when I went out he was going away running.

JUDGE:

Defense's request is denied. Proceed.

MR. ANDRÉU RIBAS:

With our exception.

PROSECUTING ATTORNEY:

Q. What, if anything, did you notice he was carrying in his hands?

MR. ANDRÉU RIBAS:

Leading.

JUDGE:

Overruled.

MR. ANDRÉU RIBAS:

Overruled that suggestion, what was he carrying in his hand?

JUDGE:

Overruled.

MR. ANDRÉU RIBAS:

Objection.

JUDGE:

Let it be entered.

PROSECUTING ATTORNEY:

Q. What was he carrying?

A. A little revolver like this, nickel-plated, short barrel.

Q. That man who is here?

A. Yes.

Q. What happened after that?

A. We took the wounded man and took him to the dispensary and from there we took him to the Medical Center."

On cross-examination he testified like this:

"Q. Tell me *whether or not you told me* there [at the preliminary hearing] to Judge Fortis *that you were quite drunk inside the bar?*

A. Yes, sir, I said so.

Q. Were you or were you not?

A. *I was drunk.*

Q. Since when had you been *drinking?*

A. *Since the afternoon.*

Q. At what time were the shots fired?

A. 10:45.

Q. You also told Judge Fortis that you were so drunk that you were like this [he makes a gesture] at the bar when the shots sounded?

A. I was drunk.

Q. And that you *were reclining because you could not stand firm?*

A. Yes.

174

Q. And two shots were heard, two shots and you came out to take a look?

A. Yes, sir.

Q. And yet, *when you reach the door and take a look this man is still running?*

A. *He was there when I came out.* (Italics ours.)

. . . . . . . .

MR. ANDRÉU RIBAS:

Q. *When you were taken to the police station you had to lay down on the bench* because you could not stand firm?

A. Yes, sir.

. . . . . . . .

Q. Tell us then, gentleman, when you get drunk is your sight affected?

A. No, sir.

Q. You remain as if nothing happened?

A. No.

Q. What happens when *you get 'loaded'*, what happens, do you see as when you are normal, do you walk normally?

A. Not walking.

Q. Can you think . . . ?

JUDGE:

Wait a minute, let him answer. *You say that you see the same, but not walking.*

A. I cannot walk the same.

MR. ANDRÉU RIBAS:

Q. And can you reason the same?

A. *I cannot reason the same.* (Italics ours.)

. . . . . . . .

MR. ANDRÉU RIBAS:

Q. What calls your attention is two shots fired while you are reclining against the bar, still inside the bar, how can you ascertain to these gentlemen that he was outside and that he ran?

A. Because I came out and saw him, sir.

Q. At what *distance was this man from you?*

A. At about thirty-five feet.

Q. And can you please tell me . . .

JUDGE:

Q. From there to where?

MR. ANDRÉU RIBAS:

If it is more.

A. From about here to where the policeman is.

JUDGE:

About thirty-five feet, colleague.

MR. ANDRÉU RIBAS:

Q. From where to where? How was the lighting?

A. Semi-dark; but you could see.

Q. At ten-thirty in the night?

A. Yes, sir.

Q. Or was it completely dark?

A. No, sir.

Q. What you saw at 35 feet was a man with his back turned?

A. With his back turned.

Q. Was he running facing you, or was he going with his back like this, I ask; was he running in opposite direction with his back turned on you or his front to you, let us see?

A. It is assumed that in order to run he has to have his back turned on me.

Q. Then he is in this position, you there and he like this?

A. No, sir.

Q. Like this?

A. When I came out I saw him facing me.

.    .    .    .    .    .    .    .    .

JUDGE:

At what moment do you see him facing you, that is the question which has been made to you, you have been asked.

A. At the time he *had the revolver in his hand.*

MR. ANDRÉU RIBAS:

Q. Doing what?

A. When he fired at the man.

Q. But you did not see him fire?

A. But I heard the detonation and I came out.

Q. You heard the detonations and you say that when you came to the door you saw him running away, at 25 feet, yes or no?

A. I saw him abreast and then he ran away.

Q. Look gentleman, let us see, if we agree to what you told the prosecuting attorney, you are inside the bar, yes or no?

A. Yes, sir.

Q. You are quite drunk, yes or no?

A. Yes.

Q. You do not know how many drinks you had had, yes or no?

A. No, sir.

Q. When you are drunk your movements are not normal, yes or no?

A. No.

Q. Did you hear two shots?

A. Yes, sir.

Q. Then you who are so drunk you start moving and I ask you did you already know, from the moment in which you heard the detonations, that they had been across there?

A. Of course.

Q. Did you or did you not say that when you came out you saw defendant running?

A. I saw him, I saw him, I saw him when he ran away.

Q. You are saying 'I saw him and I saw him' because this man or a prosecuting attorney told you before that you had to say whatever was in that statement otherwise you would be incarcerated?

A. There is the statement I am telling the truth.

Q. I ask that, *whether or not they told you that if you did not sustain that today you would be incarcerated?*

A. *Yes, sir.*

Q. Who told you that?

A. Montalvo.

Q. Did he tell you that today?

A. And Fortis.

Q. Have you ever talked to the colleague, this prosecuting attorney, did you talk to him before coming here?

A. Yes.

Q. What did this colleague, prosecuting attorney Rebollo, tell you?

A. That if I lied I would be imprisoned.

Q. Did you tell or did you not tell Judge Fortis there in front of me that you had said it was Bullín at the police station because you wanted to leave and the others said it was one Bullín?

A. Sure, since I wanted to leave.

JUDGE:

Q. Did you tell Judge Fortis that you said it was Bullín because you wanted to leave?

A. No, sir.

.         .         .         .         .         .         .         .         .

A. I saw him, sir. My eyes never fail.

Q. Are they infallible even when you are drunk and even in dark places?

A. Yes.

Q. And *how was this man dressed?*

A. *Not that.*

Q. See how your eyes failed!

JUDGE:

Please, no comments.

MR. ANDRÉU RIBAS:

Q. You have just said that your eyes do not fail, you have ascertained that you have seen this man, now I ask you how was he dressed and you tell me you do not know, don't you know that?

A. I cannot describe his clothes.

Q. That is the most visible thing of a person.

A. I did not notice that.

Q. What did you notice, the head, here?

JUDGE:

*Whether he noticed the head?*

A. *No.*" (Italics ours.)

Witness Juan José Rodríguez testified that he did not see appellant at the time and place of the shots in question, that he heard a shot and felt wounded and he saw a person with his back turned who went away running; that appellant had had no argument with witness; he did not hear the one who fired at him; the latter did not stop to talk to witness; he cannot tell whether appellant looks like the person who was running; that "he sure does not look like him to me";

when he was asked "Does he look like him?" he answered "No, sir"; *that the place was practically dark.*

We will consider the assignments jointly for they are interrelated.

We are confronted, essentially, with a problem of identification of the person who fired the shots in this case. Of the four witnesses presented by the prosecuting attorney only one, Luna Roque identified appellant as the person who fired the two shots at the time and place of the occurrence; that he saw him running away from there carrying "a small revolver like this, nickel-plated, short." We do not think that this testimony deserved the credit given to it. On the contrary we conclude that if the other witnesses who were at the place could not identify appellant as the one who fired, much less could Luna Roque identify him since he admitted that he was drunk, drinking since the afternoon, reclined against the bar because he could not stand firm. Though he testified that when he is under such conditions he cannot walk normally, he sustained that his sight is not affected, that he could see appellant though the place, according to another witness, "was practically dark." He could not tell how the one who fired was dressed since he did not notice that. He was the only one who testified that he could see appellant face to face with the revolver in his hand despite the fact that he was at a greater distance than the other witnesses, and besides, drunk, reclining against the bar, so that necessarily while he got up and walked to the door, the one who fired had time to turn his back and start running, movement which he must have done rapidly since the other witnesses who were closer could not see him face to face but saw him when he was running away.

On the other hand, the first witness, who saw when the one who fired arrived, and heard him talk to the one he wounded in the stomach, said that the one who fired was taller and of a lighter complexion than appellant, while the

wounded one could not identify him even though he never lost consciousness and saw him running with his back turned toward the place.

In our opinion, from the evidence introduced reasonable doubt arose as to the identification of the one who fired.

In *People* v. *Olivencia*, 93 P.R.R. 824 (1967), the situation was completely different. According to the majority opinion of the Court, in that case there was no clear and convincing evidence that appellant was carrying a prohibited weapon. The case at bar involves a problem of identification of the person who fired some shots at a bar. The evidence, in our opinion, was not only insufficient as to identifying appellant as such person, but rather that it tended to show that another person, and not appellant, was the one who fired the shots in question.

In view of the foregoing, the judgments rendered in this case by the Superior Court, San Juan Part, on February 23, 1967, will be reversed and appellant acquitted.

Mr. Chief Justice Negrón Fernández dissented. Mr. Justice Torres Rigual delivered a dissenting opinion in which Mr. Justice Blanco Lugo and Mr. Justice Rigau concur.

—O—

MR. JUSTICE TORRES RIGUAL, with whom MR. JUSTICE BLANCO LUGO and MR. JUSTICE RIGAU concur, dissenting.

San Juan, Puerto Rico, April 2, 1969.

I dissent. We have held hundreds of times that the weighing of the facts made by the trier which is based on the evidence should not be disturbed on appeal. These decisions turn into useless and empty rhetoric when we set aside, as we are doing in this case, a judgment of conviction founded on the conviction by a jury, against which it has not even been attempted to charge—because there is no ground for it— passion, prejudice, or partiality.

Any intelligent person, and even more, if he has a good legal training, can, if he is determined to do so, reach the conclusion he pleases with a written record. The interpretation may also show a competent analytical ability but will not necessarily do justice, which is, in the last instance, the duty of this Court.

We only have the written record before us, without any of the imponderable elements which may have exerted influence on the mind of the jury. We are not acquainted with the subtleties which were disclosed in the way the witnesses testified, in their gestures or hesitations. The multiple incidents of a criminal proceeding are not completely revealed in the record. A trial is an intense human drama, a complex of statements and contradictions of reciprocal influences, some apparent and others real, which can be completely understood only when the evidence is considered as *a whole* and not merely the one which appears from the written record.

Therefore, I *insist* that we may disturb a verdict only when there is an absolute lack of evidence, or when the same is unimportant, or scarcely satisfactory because it is intrinsically incredible or inherently improbable. When we apply this rule to the case at bar the affirmance of the judgment is inescapable.

All that is involved in this case is whether or not appellant was identified. The determination of said fact is exclusively incumbent upon the jury. There was evidence of the identification of the accused, as it is inferred from the summary of the evidence transcribed in the opinion of the Court itself. It was believed by the jury. We cannot disregard the fact that two witnesses for the prosecution, by reasons we do not know, altered their testimony. One of them was convicted of perjury. The third witness, Agustín Luna Roque, testified that he saw appellant with the revolver in his hand while he was running to get away from the place. He persisted in his testimony despite the strong and clever cross-examination to

which he was submitted by the defense. However, the opinion of the Court concludes that there was reasonable doubt as to the identification of defendant. Whether or not there was reasonable doubt was a question exclusively incumbent upon the jury and not upon this Court on appeal. Few judgments of conviction would prevail if we reverse so thoughtlessly, as we are doing in this case, because there is a discrepancy as to reasonable doubt between this Court on appeal and the trial judge.

The first and fourth errors[1] which charge the trial judge that he injured defendant's right to a fair and impartial trial in making certain statements before the jury[2] also deserve a comment. We have read and reread the record carefully. We note on more than one occasion the true effort of the judge to discover the truth. It cannot be disregarded that two witnesses for the prosecution unexpectedly altered their testi-

---

[1] The majority opinion does not make reference to these errors since it was unnecessary in view of the conclusion it reached.

[2] It refers principally to the following incident which appears at page 31 Tr. Ev.:

"JUDGE:

Q. Is that man you know as Bullín a human being, a ghost, a negro, a white man?

A. The name.

Q. How was that man you know as Bullín, was he a white or a colored man?

A. As I saw him in my own way he was a tall skinny man.

JUDGE:

You may proceed prosecuting attorney.

JUDGE:

Q. Are you over 18 years old?

A. Eighteen.

Q. Eighteen already?

A. Yes.

JUDGE:

Fine. Marshal bring me the Penal Code. Proceed.

MR. ANDRÉU RIBAS:

Let us ask the jury to withdraw.

JUDGE:

Of course. Withdraw the jury. (The jury withdraws from the courtroom.)"

mony, answering repeatedly with evasions. There is nothing more injurious to the honor and dignity of a court than an openly perjured testimony. Before this situation, it was not only lawful but indispensable for a good administration of justice, that the judge would have made an effort to clarify the facts. His intervention for those purposes should be reason for praise and not for censure. The judge is under the obligation in the exercise of his high ministry of guiding the procedures with confidence and firmness defending the respect, the dignity, and the honor in the administration of justice. That is the only way that confidence in the judicature may be inspired and its prestige in the community preserved.